# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

ROBIN H.,

Plaintiff,

v.                                                5:18-CV-225
                                                  (ATB)

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

HOWARD D. OLINSKY, ESQ., for Plaintiff
VERNON NORWOOD, ESQ., Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER
United States Magistrate Judge

## MEMORANDUM-DECISION AND ORDER

This matter was referred to me, for all proceedings and entry of a final judgment,

pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in

accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y.

Local Rule 73.1 and the consent of the parties. (Dkt. No. 4.)

## I.    PROCEDURAL HISTORY

Plaintiff protectively filed an application for Supplemental Security Income

("SSI") on May 14, 2014, alleging disability beginning on July 1, 2010. (Transcript

("T.") at 156, 293-98.) This was plaintiff's second application for SSI benefits.

Plaintiff's first application was denied initially, and by an Administrative Law Judge

("ALJ") on January 10, 2013. The denial was subsequently upheld by the Appeals

Council and became the final decision of the Commissioner. (T. 11.) Plaintiff did not appeal further. Instead, plaintiff filed the current application.

Plaintiff's May 14, 2014 application was denied initially on September 2, 2014. (T. 156.) She requested a hearing, which was held on September 20, 2016 and continued on March 7, 2017 before ALJ Jennifer Gale Smith. (T. 81-119, 120-33.) Plaintiff appeared at the September 20, 2016 hearing, represented by Megan Ortiz-Savila, Esq., and appeared at the March 7, 2017 hearing, represented by non-attorney Terry E. Schmidt. (T. 83, 122.) A vocational expert ("VE") testified at each hearing. (T. 110-17, 126-32.) In a decision dated April 7, 2017, ALJ Smith found plaintiff was not disabled. (T.11-21.) On December 20, 2017, the Appeals Council denied plaintiff's request for a review of ALJ Smith's decision, which then became the final decision of the Commissioner. (T. 1-3.)

## II.   GENERALLY APPLICABLE LAW

### A.   Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hire if he applied for work

42 U.S.C. § 1382(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections

404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled with-out considering vocational factors such as age, education, and work experience . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520,

416.920. The plaintiff has the burden of establishing disability at the first four steps.

However, if the plaintiff establishes that his impairment prevents him from performing

his past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

### B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine

3

whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v. Soc. Sec. Admin. Comm'r,* 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review, "even more so than the 'clearly erroneous standard.'" *Brault,* 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255,258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Monguer v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (the court is unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "pick and choose evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-

6279, 2010 WL 5072112 (W.D.N.Y. Dec. 6, 2010).

## III. FACTS

On the date of her March 7, 2017 administrative hearing, plaintiff was forty-nine years old. (T. 123)  Plaintiff completed high-school, taking regular education courses. (T. 84.)  She testified that she had two adult sons and lived with several pets in an apartment. (T. 320.)  Plaintiff had not been employed since 1992, when she stopped working to care for her children and was financially supported by her children's father.[1] (T. 85.)

Plaintiff testified that she first became disabled in July of 2010, when she broke her right ankle and underwent ankle surgery. (T. 85-86, 293-98.)  Plaintiff testified that she continued to take Tramadol for residual pain in her ankle. (T. 87.)  She reported that she was diagnosed with asthma in 1999. (T. 566.)  Plaintiff testified that, over time, her impairments increasingly limited her ability to manage her home and engage in recreational activities. (T. 102.)

From August 2011 to December 2016, plaintiff treated frequently with Asthma & Allergy Associates ("AAA") and Family Health Network ("FHN"). (T. 417-518, 632-39, 751-892, 918-21, 955-57, 972-95, 996-1000.)  Plaintiff received ongoing treatment from Dr. Rizwan Khan and various nurses at AAA for allergies, rhinitis, sinusitis, headaches, bronchitis, asthma, cough, and related symptoms, totaling about forty visits between 2011 and 2016.  (T. 417-518, 918-21, 972-95.)  In his medical source

---

[1] Plaintiff testified at her September 2016 hearing that she was living by herself at the time of the hearing. (T. 90.)

statement, Dr. Khan described plaintiff as suffering from asthma, and stated her condition was triggered by "extreme cold, heat, humidity, fumes, odors, [and] dust." (T. 959.)

At her September 20, 2016 hearing, plaintiff testified that her respiratory conditions prohibited her from working. (T. 89.) She described her asthma as "allergy-induced" and stated that it was aggravated by exposure to grass, ragweed, trees, and pollen. (T. 101-102). Plaintiff testified that her allergist instructed her not to go outside on certain days because of her allergies. (T. 102.) Shortness of breath resulted in plaintiff's hospitalization at Cortland Regional Medical Center from September 17 through September 20, 2013. (T. 397-410, 535-49.) She was diagnosed with a bilateral pulmonary embolism. (T. 395). Plaintiff suffered a second pulmonary embolism on July 23, 2014, and was again hospitalized at Cortland Regional Medical Center. (T. 535-49.) On July 26, 2014, plaintiff was "back to her baseline condition" and continued to improve. (T. 536). She was discharged home in "stable condition." (*Id.*) On December 1, 2015, plaintiff began to receive Xolair injections from Dr. Khan (T. 641), which reportedly alleviated some of her respiratory symptoms. (T. 918.)

Plaintiff's family doctor was Dr. Cherylin White of FHN, who plaintiff describes as one of her treating physicians. (Pl.'s Br. at 9) (Dkt. No. 9). On various occasions, Dr. White completed forms for the Cortland County Department of Social Services which were entitled "Medical Evaluations Regarding Employability." (T. 411, 632-37, 639.) On some of these forms, Dr. White checked boxes stating that plaintiff was "totally and permanently disabled" and "not expected to become employable," due to

6

depression and anxiety, hearing loss/deafness, arthritis, degenerative joint disease, pulmonary embolism, obesity, and asthma. (T. 411, 632-37, 639.) On some of the forms, Dr. White answered all the questions. However, on some of the forms, less than all of the questions are answered. (*Compare.* 634, on which Dr. White indicated what plaintiff's work restrictions would be *with* T. 411 on which Dr. White simply checked the boxes stating that plaintiff would be "totally and permanently disabled" and "not expected to become employable"). However, in her contemporaneous treatment notes, Dr. White described plaintiff's hearing loss as "stable," described plaintiff's asthma as "moderate" and "controlled," and noted plaintiff had no possible barriers to communication, such as deafness. (T. 774, 827-30.)

Plaintiff testified that she also sought treatment for anxiety and depression from Dr. White. (T. 104-105.) At her September 20, 2016 hearing, plaintiff testified she was depressed because she was unable to "do the things [she] used to do." (T. 106.) She described a turbulent home environment in which her sons would threaten each other's lives and her own, prompting her to seek an anxiety medication from Dr. White. (T. 105-106.) Plaintiff testified that her sons had since moved out of the home and "tolerate[d] each other." *Id.* Patricia Wood, a counselor at Cortland Department of Social Services, treated plaintiff for similar complaints in May 2013. (T. 572.) She noted that plaintiff exhibited some symptoms of anxiety from "domestic violence," but fell short of the threshold for clinical depression. *Id.*

Dr. White's reports include statements of plaintiff's leisure activities, including plaintiff's care of her pets and her enjoyment of gardening and crochet. (T. 810, 857,

868.) At her September 20, 2016 hearing, plaintiff testified that "most of the day" she "[sat] and watch[ed] TV," and that she could no longer crochet, craft, or garden (T. 91-92, 106.) Plaintiff occasionally went on walks about the length of a city block, but testified that her ability to walk was limited by leg swelling and soreness. (T. 91-92.) She did not drive and testified that she never had a driver's license. (T. 90.) Plaintiff stated that she cooked for herself and cleaned her own home. (T. 91.) Although she was able to shop for groceries herself, plaintiff testified that she struggled to lift and grip items like a gallon of milk because of carpal tunnel syndrome. (T. 90, 93-96.)

Plaintiff's carpal tunnel syndrome was treated by Dr. Frank J. Pompo of Regional Medical Practice, beginning in 2015. (T. 894-96.) An EMG revealed bilateral median neuropathy in both plaintiff's wrists on November 24, 2015. (T. 897-900.) Plaintiff underwent a right carpal tunnel release on December 4, 2015 and a left carpal tunnel release on December 17, 2015. (T. 622, 624.) Plaintiff alleges the surgeries worsened her condition and that she is still limited by carpal tunnel syndrome. (T. 95-97.)

The ALJ's decision provides a detailed statement of the medical and other evidence of record. (T. 11-21.) Rather than reciting the entirety of this evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff.

## IV.   THE ALJ'S DECISION

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since her application date of May 14, 2014. (T. 13.) At step two, ALJ Smith

found ten severe impairments: obesity, asthma, allergic rhinitis, sinusitis, hearing loss, degenerative joint disease, status-post pulmonary embolism, edema status-post phlebitis, deep venous thrombosis, and residuals status-post bilateral carpal tunnel releases. (T. 13.) Plaintiff's determinable impairments of gastroesophageal reflux disease, hypothyroidism, bilateral cataracts, and history of kidney disease were found not severe. (Tr. 13-14.) At step three, the ALJ found that plaintiff's impairments did not meet or medically equal the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 (T. 17.)

At step four, ALJ Smith determined that plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. 416.967(b), with some additional limitations. (T. 15.) Specifically, she found plaintiff capable of sitting for eight hours, standing for five hours, and walking for three hours. *Id.* ALJ Smith found plaintiff could frequently lift, carry, push, and pull up to ten pounds and occasionally eleven to twenty pounds. *Id.* Though plaintiff could not kneel, crouch, or crawl, the ALJ found her capable of occasionally stooping and climbing ramps and stairs. *Id.* Plaintiff's exposure to respiratory irritants should be limited, and she retained the ability to hear and understand oral instructions and communicate. *Id.*

The ALJ found plaintiff had no past relevant work. (T. 20.) The ALJ concluded that plaintiff's medically determinable impairments could reasonably be expected to produce her alleged symptoms, but that plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and the record. *Id.* At step five, ALJ Smith relied on VE testimony

and found that plaintiff would be able to perform jobs that existed in significant numbers in the national economy. *Id.* Therefore, the ALJ determined that plaintiff had not been under a disability from the application date of May 14, 2014 through the date of her decision. (T. 21.)

## V.   **ISSUES IN CONTENTION**

Plaintiff raises the following arguments:

1.   The ALJ's RFC determination is not supported by substantial evidence because she failed to follow the treating physician rule and instead gave the greatest weight to a non-treating, non-examining physician. (Pl.'s Br. at 12-21) (Dkt. No. 9).

2.   The ALJ's RFC determination is not supported by substantial evidence because, after crediting the opinion of Dr. Kunstadt, the ALJ failed to incorporate the doctor's opinions into the final RFC determination. (Pl.'s Br. at 21-23.)

Defendant argues that the ALJ properly weighed the opinions of Drs. White and Kunstadt, and that her decision was supported by substantial evidence. (Def.'s Br. at 3-15) (Dkt. No. 12). For the following reasons, this court agrees with defendant and will dismiss plaintiff's complaint.

**VI.**   **RFC EVALUATION/TREATING PHYSICIAN**

   **A.**   **Legal Standards**

      **1.**   **RFC**

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis…" A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R. §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F. 2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. At 183; *Sullivan v. Secretary of HHS,* 666 F. Supp. 456, 460 (W.D.N.Y.

1987)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing SSR 96-8p, 1996 WL 374184, at *7).

### 2. Treating Physician

A treating source's opinion on the nature and severity of a claimant's impairments is entitled to controlling weight where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and where it is "not inconsistent with the other substantial evidence" of record. *Estrella v. Berryhill*, No. 17-3247, 2019 WL 2273574 (2d Cir. May 29, 2019). *See also Halloran v. Barnhart*, 312 F. 3d 28, 32 (2d Cir. 2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). In *Estrella*, the court held that if the treating physician's opinion is not given "controlling weight," the ALJ must then determine how much weight to give the opinion by "explicitly" considering such factors as: (1) the frequency, length, and nature of the treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist. *Estrella*, 2019 WL 2273574 at *2 (citations omitted). An ALJ may not arbitrarily substitute his own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F. 3d 72, 79 (2d Cir. 1999).

### B.    Application

Plaintiff argues that Dr. White's opinion is entitled to controlling weight, and that the case must be remanded because the ALJ failed to give it the appropriate weight. (Pl.'s Br. at 11-23.) This court disagrees with plaintiff for several reasons.

### 1.    Dr. White's Medical Records Are Internally Inconsistent

Dr. White's check-box "form" opinions, in addition to being conclusory, are often inconsistent with her contemporaneous treatment notes.  For example, on June 17, 2014, Dr. White submitted a "Medical Evaluation Regarding Employability" for the Cortland County Department of Social Services, in which she checked a box, describing plaintiff as "totally and permanently disabled" and "not expected to become employable." (T. 636). Above this box, plaintiff's diagnoses were generally listed as depression, pulmonary embolism, degenerative joint disease ("DJD"), obesity, and asthma, and the "prognosis" was "guarded. (T. 636.)

The form contained no explanation or basis for Dr. White's conclusion that plaintiff was "totally" disabled, and the doctor left blank the spaces on the form that requested a statement of "work restrictions" in terms of sitting, standing, walking, and lifting.[2]  Approximately one month prior, on May 14, 2014, in a contemporaneous

---

[2] Dr. White may have believed that if she found that plaintiff was "totally disabled," she did not need to complete the portion of the report which asked for these limitations. (*See* T. 633).  On April 20, 2015, Dr. White did complete the "restrictions" section of the form, stating that plaintiff could only stand "10%," walk "< 10%," sitting to "10%," and lifting to 5 pounds "very occ." (T. 634).

13

treatment note, Dr. White reported that plaintiff reported **no symptoms** of depression.[3] (T. 827.) The purpose of plaintiff's visit was a "follow up visit" and for a contraceptive injection, but Dr. White performed a full evaluation. (T. 827, 828, 827-31.)

Plaintiff also denied depression or anxiety symptoms in February of 2014. (T. 839). Dr. White's February 25, 2014 physical examination, showed that plaintiff's gait and station were "normal," and she had full strength and range of motion in both upper and lower extremities, with "no joint enlargement or tenderness." (T. 840). Plaintiff reported that "so far her allergies [had] been good," and she kept kittens at home without difficulty. (T. 828). Plaintiff denied "cough, difficulty breathing, shortness of breath, . . . [and] wheezing." (T. 828). The physical examination showed "mild allergy changes," and her lungs were "clear to ascultation bilaterally, with no rales, rhonchi, or wheezes." (T. 831).

On April 1, 2014, in a "follow up" office visit with Dr. White, plaintiff also denied any symptoms of depression. (T. 832). Plaintiff complained that her leg "still swells" from the pulmonary embolism, and she reported that her elbows and knees were "sore," that she had back pain and joint pain, and that her right carpal tunnel syndrome bothered her "off and on." (T. 833-34). However, the doctor did not indicate any limitations as a result of plaintiff's complaints. With respect to plaintiff's respiratory problems, the doctor noted that her lungs were clear, with no "rales, rhochi, or wheezes." (T. 834).

---

[3] Plaintiff answered "not at all" to questions asking plaintiff whether in the previous two weeks, she had "little interest or pleasure in doing things," "been feeling down, depressed or hopeless," feeling nervous, anxious, or on edge," and "unable to stop or control worrying." (T. 827-828).

With respect to plaintiff's hearing, on December 24, 2014 and December 7, 2015, among the listed diagnoses of depression, anxiety, and pulmonary embolism, Dr. White's form-reports described plaintiff as "deaf".[4] (T. 633, 635). Dr. White checked the boxes indicating plaintiff was "totally and permanently disabled" and "not expected to become employable". (T. 633.) However, in February (T. 840), April (T. 834), and May of 2014 (T. 831), Dr. White reported that plaintiff's hearing was "grossly intact," and on October 1, 2015, Dr. White noted that plaintiff's hearing loss was 50% and "stable" (T. 774). Plaintiff reported no depression or anxiety symptoms during her January 20, 2015, April 16, 2015, July 16, 2015, September 17, 2015, October 1, 2015, and January 28, 2016 visits to Dr. White's office, even though Dr. White noted a "history" of depression.[5] (T. 797, 792, 788, 781, 773, 775, 769.)

On October 1, 2015,[6] plaintiff asked if her pain medication could be increased (T. 773), but later during the examination, she "denie[d] back pain, joint pain, other pain . . . joint swelling, body aches, muscular aches, muscle cramps, muscle weakness, stiffness, [or] recent injury." (T. 774). During her appointment on January 28, 2016, plaintiff answered "no" to the question "*Are you currently having any pain which . . .*

---

[4] The court also notes that the form-report, dated June 17, 2014 does not even list hearing loss as a diagnosis (T. 636), and the June 17, 2015 form-report noted only a diagnosis of "↓hearing." (T. 634).

[5] Notwithstanding listing the "history" of depression, Dr. White found "no depression, anxiety, or agitation" on October 1, 2015.

[6] The October 1, 2015 visit was plaintiff's yearly physical. (T. 772, 774).

Affects your activity level? [or that] You would like your provider to address?"[7] (T. 768) (italics in original). During the October 15, 2015 visit, plaintiff also rated her health "in general" as "Good."[8] (T. 773). The January 28, 2016 visit was for contraception management, and the doctor's report noted "No other concerns or complaints."[9] (T. 769). Most of Dr. White's contemporaneous reports are for general physical examinations or for contraceptive management. (T 751-892.) There are no limitations assessed in any of the contemporaneous progress notes that would support a finding of "total" disability as expressed in the check-box forms submitted to the Cortland Department of Social Services.

## 2. Dr. White's Medical Records Are Inconsistent with Other Substantial Evidence of the Record

Consistent with *Estrella*, in *Prince v. Astrue*, the Second Circuit held that a treating physician's opinion was not entitled to controlling weight when it was at odds with the opinions of four other physicians, indicating that overwhelming disagreement with the treating physician's opinion is sufficient to give the treating physician's records less than controlling weight. *Prince v. Astrue*, 514 F. App'x. 18, 19 (2d. Cir. 2013).

---

[7] Plaintiff gave the same answer to the physician's assistant on January 2, 2015, April 16, 2015, July 16, 2015 and on September 17, 2015 when plaintiff went to Dr. White's office complaining of a cough. (T. 792, 781, 787).

[8] Plaintiff also rated her own health as "generally" good on January 2, 2015, when she went to Dr. White's office complaining of sinusitis. (T. 801). Plaintiff's "Chief Complaint" was listed "cold symptoms." (T. 803).

[9] The January 28, 2016 report was signed by PA Megan Somers. (T. 771).

In this case, Dr. White's form evaluations are also "inconsistent with the other substantial evidence" of the record. Though as stated above, Dr. White indicated plaintiff was "deaf" on three check-box Medical Evaluations Regarding Employability, no other medical records indicate that plaintiff was deaf. In fact, during plaintiff's September 20, 2016 hearing, plaintiff's hearing "loss" was discussed. (T. 83-84). The actual audiology report in the record states that plaintiff's hearing loss was "mild/moderate" and indicated a 50% loss, as Dr. White noted in her October 1, 2015 contemporaneous progress note. (T. 774, 893). Plaintiff wore hearing aids to correct the impairment. (T. 83-84). Thus, although plaintiff has a hearing impairment, she is not deaf, and there is no indication that her hearing loss is disabling. Plaintiff appeared to have no problem hearing or answering the questions posed to her at any of her hearings.

Plaintiff does suffer from asthma. However, during her July 10, 2014 visit to Asthma and Allergy Associates, plaintiff reported "minimal cough, [and] deni[ed] shortness of breath, chest tightness or wheezing." (T. 643). She had the most difficulty being outside in humid conditions, and she reported to the doctor that she "got rid of 2 guinea pigs since her last visit which she feels has helped." *Id.* In the section of the report, entitled "Allergic Working Diagnoses," Nurse Practitioner ("NP") Linsey R. Petrie stated that plaintiff had "asthma without status asthmaticus,"[10] and later recommended that plaintiff use her rescue inhaler "prior to exercise to prevent exercise

---

[10] Status asthmaticus is defined as "severe acute asthma." https://www.ncbi.nlm.nih.gov/ pubmed/4083236. Thus the statement that plaintiff was "without status asthmaticus" is a reflection on the lack of severity of plaintiff's asthma symptoms.

induced symptoms and every 4-6 hours as needed for cough, shortness or breath, or wheezing." (T. 644, 645). NP Petrie's examination showed that plaintiff's respiration rate was normal, there were no rales, rhonchi or wheezes over the lungs "bilaterally," and there was no prolonged expiratory phase. (T. 645). NP Petrie's final assessment was "Asthma Extrinsic[11] Unspecified, . . . Rhinitis Allergic Due to Pollen . . . Rhinitis Allergic Due to Other Allergen." (T. 645).

Plaintiff also treated with Dr. Manoj Kumar and NP Deborah Warner of CNY Medical Professionals for her respiratory complaints. (T. 1001.) At her November 15, 2016 visit, plaintiff stated she was "doing very well" and "state[d] she did have a couple of sinus infections but could still breathe." *Id.* Plaintiff denied any respiratory concerns since her 2015 polypectomy. *Id.* NP Warner did not note any environmental allergies, and stated plaintiff was allergic only to "Adhesives, Erythromycin, Codeine, [and] Levaquin." *Id.* Plaintiff was diagnosed with "allergic rhinitis"[12] and told to follow up as needed. (T. 1002.) She reported that her medications resulted in "no side effects." (T. 430, 433.) On September 23, 2016, Dr. Kumar completed a medical source statement in which he opined, "This patient has no limitations from work regarding her sinus symptoms." (T. 962.)

---

[11] Extrinsic Asthma is asthma that is triggered by an allergen. https://www.healthline.com/health/intrinsic-asthma#symptoms.

[12] "Allergic rhinitis" is defined as "an allergic disorder characterized by an exaggerated immune response to environmental triggers." It is also known as "hay fever." https://www.webmd.com/allergies/understanding-hay-fever-basics.

Plaintiff did suffer a bilateral pulmonary embolism on September 17, 2013. (T. 395.) She was hospitalized for three days at Cortland Regional Medical Center. (T. 397-410.) She suffered a second pulmonary embolism on July 23, 2014. (T. 535-49.) Plaintiff was described as "back to her baseline" by July 26, 2014 and discharged the same day. (T. 549.) She reported that her pulmonary emboli were "gone" and their return was prevented with Xarelto.[13] (T. 88.) Dr. White's forms continued to list plaintiff's pulmonary emboli as a basis for disability through April 20, 2016 (T. 632), although plaintiff had not been treated for the emboli since 2014. Thus, although Dr. White's check box forms listed pulmonary emboli as a general "diagnosis," there is no explanation of how this diagnosis formed the basis for Dr. White's finding that plaintiff was not "employable."

Dr. White also listed degenerative joint disease ("DJD")[14] as one of the general diagnoses on the Medical Evaluations Regarding Employment dated November 5, 2015, April 20, 2016, November 8, 2014, and May 5, 2014. (T. 633-36.) In a report completed for the New York State Office of Temporary and Disability Assistance, dated June 30, 2014 (T. 520-34), Dr. White stated that plaintiff had a "wide based" gait and that she used a cane when there was increased pain in her joints. (T. 526).

---

[13] Xarelto is a blood thinner or "anticoagulant." https://www.xarelto-us.com/

[14] "Degenerative joint disease" is also known as "osteoarthritis" or "arthritis." https://www.aapmr.org/about-physiatry/conditions-treatments/pain-neuromuscular-medicine-rehabilitation/degenerative-joint-disease. Plaintiff, the ALJ, and plaintiff's doctors use these terms interchangeably throughout the record.

On the June 30, 2014 report, Dr. White did complete an RFC evaluation, wherein she found that plaintiff could lift up to 15 pounds occasionally, but was limited to standing and/or walking to less than two hours per day, sitting "less than 6 hours per day," but had no limitations pushing, pulling, or using foot controls. (T. 529). Dr. White listed plaintiff's "current functional assessment" as "Independent." (T. 530). Dr. White completed a range of motion chart as part of her June 30, 2014 report which resulted in mostly normal findings.[15]

Dr. Elke Lorenson, the consultative examiner and an internist, examined plaintiff on August 6, 2014. (T. 566-69.) Dr. Lorenson described plaintiff's gait as "normal" and noted plaintiff used "no assistive devices" to walk. (T. 567.) Upon conducting a musculoskeletal exam, Dr. Lorenson found "full rotary movement bilaterally." (T. 568.) She found plaintiff's "joints stable and nontender," with no "swelling or effusion" or other physical indications of arthritis. *Id.* Dr. Lorenson found "no gross limitations sitting, standing, [and] walking" and only "moderate restrictions bending, lifting, reaching, and squatting." (T. 569.)

On the Medical Evaluations Regarding Employability from July 26, 2013 to November 5, 2015, Dr. White noted plaintiff suffered from depression and anxiety. (T. 633-639.) On March 13, 2013, Ms. Patricia Wood of Cortland County Department of Social Services evaluated plaintiff. (T. 572.) She found plaintiff did not meet the threshold for clinical depression. *Id.* Ms. Wood found plaintiff capable of working eight

---

[15] The only abnormal findings included a reduced degree of forward flexion of the spine (70 out of 90 degrees) and an inability to dorsiflex her feet to the normal 20 degrees. (T. 534.) Her plantar flexion was full range. (*Id.*)

hours a day for five days a week. *Id.* Though she did note "symptoms of anxiety," Ms. Wood did not make a formal diagnosis of anxiety or indicate plaintiff met the threshold for it. *Id.*

On August 6, 2014, plaintiff was evaluated by Dr. Dennis Noia, a consultative psychologist. (T. 561.) Plaintiff reported no history of psychiatric care to Dr. Noia. *Id.* She "[did] not report any significant depressive, manic or anxiety related symptoms, or symptoms of a formal thought disorder or cognitive dysfunction." (T. 562.) Plaintiff informed Dr. Noia that "depression and anxiety [are] usually controlled with medication." *Id.* Dr. Noia found no abnormalities in plaintiff's appearance, speech, thought processes, affect, mood, sensorium, orientation, attention and concentration, recent and remote memory skills, cognitive functioning, insight, and judgment. (T. 561-62.) He opined, "Vocationally, the claimant appears to have no limitations." (T. 562.)

On September 20, 2016, Dr. White completed a Medical Source Statement in which she incorporated extreme limitations on plaintiff's physical abilities. (T. 955-57). Dr. White found that plaintiff could only sit for two hours, stand for fifteen minutes at a time, and could only sit, stand/walk a total of less than two hours in a day. (T. 955-56). Plaintiff needed a job where she could change positions "at will." (T. 956). However, plaintiff did not require "a cane or any assistive device." Plaintiff could rarely lift less than ten pounds and "never" lift any more that ten pounds, and could never stoop/bend, crouch/squat, or climb ladders. She could "rarely" climb stairs, and "occasionally twist." (*Id.*) Dr. White opined that plaintiff could only "rarely" look up and "hold [her] head in a static position." She could "never" use her hands to grasp, turn, or twist

objects, never use her fingers for fine manipulation, and only "rarely" use her arms for reaching, including overhead. (*Id.*) Dr. White also found that plaintiff would have to take an unscheduled break at work every 90 minutes and rest 15 minutes before going back to work. (T. 957). Plaintiff would be off-task 20% of the day, would have good and bad days, and would be absent about four days every month due to her impairments. (*Id.*)

The ALJ gave no weight to this statement and found that the doctor's comments about proposed absences and time off work were "completely speculative." (T. 18). Based on Dr. White's progress notes and the other doctor's reports, the ALJ's findings were supported by substantial evidence. Conflicts in the evidence are for the ALJ to resolve. *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). In this case, the ALJ properly weighed the conflicting evidence and found that the treating physician's statement of "total disability," and the extreme restrictions in her Medical Source Statement of September 2016, were inconsistent with other substantial evidence of record.

### 3. Dr. White's Opinions of Total Disability Are Inconsistent with Plaintiff's Activities

Dr. White's statements that plaintiff was totally disabled and her restrictive Medical Source Statement were contradicted by plaintiff's reports of her own activities. In *Wavercak v. Astrue*, the Second Circuit held that an ALJ is not required to defer to a treating physician's opinion if the treating physician's assessment conflicted with plaintiff's description of his daily activities. *Wavercak v. Astrue*, 420 F. App'x. 91, 94

(2d Cir. 2011). In *Wavercak*, plaintiff's daily activities included cleaning, cooking, shopping, and visiting family, and plaintiff was found not disabled. *Id.* In this case, plaintiff likewise reports cleaning (T. 563), cooking (T. 563), shopping (T. 460), and visiting family (T. 494).

In June 2013 (T. 868), August 2013 (T. 857), and November 2014 (T.810), plaintiff told Dr. White that she enjoyed crochet. This is at odds with plaintiff's testimony at her hearing that she could no longer finely manipulate due to carpal tunnel. (T. 92.) Plaintiff testified that she is able to carry and unload her groceries from a cart without assistance, and does her own cooking and cleaning. (T. 90-91.) These activities contradict her assertion that carpal tunnel would cause her to struggle to lift a one-pound file (T. 125) and inhibit her from manipulating buttons and keys. (T. 97, 124-25).

In September 2016, plaintiff testified that she had not gardened for over a year because her impairments made it impossible. (T. 92.) On April 26, 2016, plaintiff sought treatment for a rash that she contracted while gardening outside (T. 730), which supports a finding that plaintiff's activities were more extensive than she stated at the hearing. (T. 633-39.) At the same hearing, plaintiff stated that her medications made her "tired all the time". (T. 103-104). Dr. White's Medical Source Statement indicated that the side effects of plaintiff's medications included chronic fatigue, risk of bleeding,[16] and "vision, speech or hearing disturbance." (T. 955). However, during medication reviews with Dr. Khan, plaintiff stated she experienced "no side effects to

---

[16] The "risk of bleeding" is likely due to plaintiff's blood thinners, but there is no indication that this risk would affect plaintiff's ability to work.

medications." (T. 430, 433, 495.) In addition, there is absolutely no indication how any of plaintiff's medications might affect her vision, speech, or hearing. This statement appears to be completely unsupported. On June 30, 2014, Dr. White wrote that plaintiff used a cane to assist with ambulation. (T. 522, 526.) However, in the September 30, 2016 Medical Source Statement, Dr. White stated that plaintiff did **not** require a cane or any other assistive device. (T. 956). Plaintiff testified at her September 20, 2016 hearing that she could not walk around the mall or Wal-Mart, and needed to use a seated cart to navigate stores. (T. 106.) Yet plaintiff reported to Dawn Paulson, FNP-C, that she was able to ambulate around Tops Friendly Market[17] without assistance. (T. 460.)

At her September 20, 2016 hearing, plaintiff asserted that her respiratory conditions prevented her from working. (T. 89.) She contended that she was housebound some days to avoid exposure to allergens. (T. 102.) According to Dr. White's notes, plaintiff reported keeping "pets that include 2 birds, rabbits, [and] guinea pigs." (T. 810, 857, 868.) Plaintiff also told Dr. White that she kept kittens at her home (T. 828). At her hearing, plaintiff testified that she had four cats, although she had to wear a mask to change their litter.[18] (T. 109.)

These representations contradict plaintiff's testimony that she is allergic to rabbits (T. 109) and that she cannot have any exposure to dusty materials, such as cat

---

[17]Tops Friendly Markets is a supermarket chain. https://www.topsmarkets.com/.

[18] Plaintiff testified that "[t]he only thing I can't be around is dogs . . . [a]nd rabbits, I'm allergic." (T. 109). However, on June 13, 2013 and November 4, 2014, plaintiff told Dr. White that her pets included rabbits. (T. 810, 868).

litter. (Pl.'s Br. at 21-23.) (Dkt. No. 9.) (T. 108-110.) Because Dr. White's opinions are neither well-supported by clinical and laboratory diagnostic techniques nor consistent with other substantial evidence, they are not entitled to controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). An ALJ has "complied with the dictates of the treating physician rule" as long as she has "comprehensively explained the reasons for discounting" the treating physician's opinion. *Cichocki v. Astrue*, 534 F. App'x. 71, 75 (2nd Cir. 2013). ALJ Smith has done so.[19]

Finally, Dr. White's statements that plaintiff is "totally and permanently disabled" and "unable to work" for six months or more are not controlling because such a determination cannot be made by a treating physician. *Claymore v. Comm'r of Soc. Sec.,* 519 F.App'x. 36, 38 (2013). The determination of disability is reserved for the Commissioner. *Id.* In *Claymore*, the court stated that "[a] treating physician's statement that the claimant is disabled cannot itself be determinative." *Id.* (quoting *Snell v. Apfel*, 177 F.3d 128 (2d Cir. 1999)). It is the "Commissioner who is responsible for making the determination or decision about whether [the claimant] meet[s] the statutory definition of disability." 20 C.F.R. § 404.1527(d)(1); *id.* at 38 (alterations and quotations in original). A doctor cannot make the ultimate vocational determination because the "Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability." *Snell* 177 F.3d at 133; 20 C.F.R. § 404.1527(d)(1).

---

[19] As noted above, the ALJ's RFC findings included limitations on plaintiff's exposure to respiratory irritants, consistent with Dr. Khan's opinions as to plaintiff's asthma symptoms.

### 4.    The ALJ Did Not "Transverse" the Treating Physician Rule

Where the ALJ elects not to give controlling weight to the treating physician's opinions, she must "provide good reasons for discounting them." *Zabala v. Astrue*, 595 F. 3d 402, 408 (2d Cir. 2010). Plaintiff argues that ALJ Smith has not done so. (Pl.'s Br. at 12-21) Plaintiff alleges that the ALJ has failed to give good reasons because she did not explicitly consider the four *Burgess* factors: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." (Pl.'s Br. at 20-21, quoting *Selian v. Astrue*, 708 F. 3d 409, 418 (2d Cir. 2013)).

The Second Circuit recently held that an ALJ's failure to explicitly consider the *Burgess* factors is a procedural error. *Estrella v. Berryhill*, 2019 WL 2273574, at *7. Even if the ALJ errs in her analysis of the *Burgess* factors, however, the error is harmless and the court will affirm when "a searching review of the record…assure[s] us]…that the substance of the …[treating physician] rule was not traversed." *Id*. In this case, a "searching review of the record" indicates that the treating physician rule was in no way "traversed." *See id.* at *7.

An explicit consideration of the *Burgess* factors would not have led the ALJ to a different result, so the error is harmless. *Estrella*, 2019 WL 2273574 at *7. When evaluating the "frequen[cy], length, nature, and extent of treatment," one finds that the "nature and extent of [plaintiff's] treatment" with Dr. White concerned contraceptive management and unspecialized family medicine. *Burgess v. Astrue*, 537 F.3d 117 (2nd

Cir. 2008); T. 751-892. *Burgess* requires the evaluation of "the amount of medical evidence supporting [Dr. White's] opinion." *Burgess*, 537 F. 3d at 129. As discussed above, Dr. White's conclusory opinion is not supported by objective medical evidence, and is contradicted the doctor's own contemporaneous progress notes. (T. 893.) Dr. White's findings are also contradicted by the remaining medical evidence, including findings by Dr. Noia (T. 561-64), Dr. Kunstadt (T. 946-48), Dr. Lorenson (T. 566-69), and Ms. Wood (T.572). Dr. White is a family doctor, not a specialist. (T. 89.)

Plaintiff's assertion that ALJ Smith's decision was not supported by substantial evidence is erroneous. As described above, "substantial evidence" is "more than a mere scintilla . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Halloran*, 362 F. 3d at 31. ALJ Smith's decision rests on opinions from Dr. Lorensen, Dr. Noia, Dr. Khan, Dr. Kunstadt, and Ms. Wood. (T. 16-19.) Where there is substantial evidence to support either of two or more positions, the determination is one to be made by the factfinder. *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990).

### 5. The ALJ's RFC Determination Is Supported by Substantial Evidence

Plaintiff's contention that the ALJ's RFC determination is not supported by substantial evidence because it deviates from Dr. Kunstadt's opinion fails. Dr. Kunstadt is a medical expert, who was asked to complete a medical source statement of the plaintiff's ability to perform work-related physical activities as well as answer a "medical interrogatory." (T. 19, 946-48, 949-54). Although Dr. Kunstadt suggested

that plaintiff "never" work in humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold or extreme hea[t] . . . ," the ALJ found that such a limitation was "unrealistic," but that limitation to "occasional exposure was "reasonable."[20] (T. 19). Thus, the ALJ adopted most, but not all of Dr. Kunstadt's report, and stated that she was granting the report "partial evidentiary weight." (*Id.*)

ALJ Smith clearly indicated her reasons for altering Dr. Kunstadt's respiratory limitations: "A prohibition against exposure to respiratory irritants would require that the claimant work in a clean room, which is unrealistic, but limitation to occasional exposure is reasonable. Litter produces dust, but the claimant changes the [cat] litter using a mask." (T. 19) The ALJ is not required to completely conform her RFC determination to the medical records of physicians, but only to "explain why the opinion was not adopted." SSR 96-8P (S.S.A.), 1996 WL 374184 at *7. ALJ Smith clearly did so. The only question is whether the ALJ's explanation is supported by substantial evidence. We find that it is.

The ALJ's RFC determination is supported by medical records and plaintiff's own statements, both to ALJ Smith and to her doctors. *See Halloran*, 362 F. 3d at 31. Plaintiff's bedroom is carpeted (T. 595), indicating she does not need to be in a clean

---

[20] The ALJ states that "[t]he limitation [found by Dr. Kunstadt] in handling, fingering and feeling appear based on the claimant's subjective complaints, given that Dr. Lorensen found hand and finger dexterity intact. Moreover, a review of Dr. Kunstadt's report shows that she found plaintiff could "continuously" reach (except overhead), handle, finger, and feel. (T. 15, 19, 951). The doctor found that plaintiff could "frequently" reach overhead. (T. 951). This finding is consistent with Dr. Lorensen's findings. Dr. Kunstadt did state that the exertion in pushing or pulling depended on the weight involved, and that because of her asthma, the plaintiff might be limited to "varying degrees according to whether she happens to have an exacerbation." (T. 951). The ALJ's RFC is consistent with this opinion and consistent with that of Dr. Lorensen.

room. (T. 19). Plaintiff described working outside in her garden. (T. 730). She repeatedly stated that she cared for birds, rabbits, guinea pigs, cats, and fish in her apartment. (T. 810, 828, 857.)  With respect to her hands, plaintiff told Dr. Pompo she had "no issues at all with the right hand" and only "some tenderness around the incision in the palm of her left hand" following her bilateral carpal tunnel release in 2016. (T. 629.) She told Dr. Khan she experienced no side effects from her medications. (T. 430, 433.) Plaintiff "report[ed] that she is able to dress, bathe, and groom herself. She report[ed] that she can cook and prepare food, do general cleaning, laundry, shopping, manage money, does not drive, and can use public transportation." (T. 563.)

Though plaintiff does have evidence from Dr. White supporting her position, "whether there is substantial evidence supporting [plaintiff's] view is not the question here; rather, the court must decide whether substantial evidence supports *the ALJ's decision.*" *Bonet ex rel. T.B. v. Colvin*, 523 F. App'x. 58, 59 (2nd Cir. 2013) (emphasis in original). Clearly there is substantial evidence to find plaintiff not disabled in the records of four doctors and a nurse. (T. 16-19.) The above-mentioned medical records and testimony indicate that plaintiff is capable of a greater range of activities than what was estimated by Dr. Kunstadt in her RFC, and demonstrate that the ALJ's assessment of plaintiff's capabilities is supported by substantial evidence.  (T. 20-21, 946-48.)

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the Commissioner's decision is **AFFIRMED,** and plaintiff's complaint is **DISMISSED,** and it is

**ORDERED**, that judgment be entered for the **DEFENDANT.**

Dated: July 1, 2019

Hon. Andrew T. Baxter
U.S. Magistrate Judge